Lynn DAWSEY, Plaintiff-Appellant,

Aetna Casualty and Surety Company,
Intervenor-Appellant,

v.

OLIN CORPORATION,
Defendant-Appellee.

Dallas DUGAS, Plaintiff-Appellant,

Aetna Casualty and Surety Company,
Intervenor-Appellant,

v.

OLIN CORPORATION,
Defendant-Appellee.

No. 85–4012.

United States Court of Appeals,
Fifth Circuit.

Feb. 18, 1986.

Raleigh Newman, Lake Charles, La., for Dawsey & Dugas.

Raggio, Cappel, Chozen & Berniard, Lake Charles, La., Frederick L. Cappel, Michael S. O'Brien, Lafayette, La., Donald C. Massey, Robert E. Couhig, Jr., New Orleans, La., for Aetna.

Scofield, Bergstedt, Gerard, Mount & Vernon, Thomas M. Bergstedt, J. Michael Veron, Lake Charles, La., for Olin Corp.

Before BROWN, REAVLEY, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Plaintiffs-appellants Lynn Dawsey and Dallas Dugas and intervenor-appellant Aetna Casualty and Surety Company (Aetna) appeal from a judgment for defendant-appellee Olin Corporation (Olin), entered after a jury answered special interrogatories in Olin's favor following an extended trial of this case. Finding that the able trial judge committed no reversible error in any of the numerous issues raised by the appellants, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Olin operates an industrial chemical plant in the petrochemical complex west of the Lake Charles, Louisiana, area. On the morning of June 2, 1982, Lynn Dawsey and Dallas Dugas were working as construc-

tion carpenters for J.A. Jones Construction Co. (J.A. Jones) at the Conoco refinery just north of the Olin plant. Between 10:20 and 10:30 a.m. a valve malfunctioned at the Olin plant and released approximately .600 pounds of a chemical known as phosgene into the atmosphere.[1]

A southeast wind carried the phosgene towards the plaintiffs' location approximately 740 yards north of the Olin plant. After Olin reported the release to Conoco, Conoco had all the employees of J.A. Jones, including Dawsey and Dugas, taken to the St. Patrick Hospital Emergency Room in Lake Charles by bus. A physician examined both plaintiffs and ordered chest x-rays and blood gas analyses; the examinations did not indicate a serious exposure to phosgene, and the x-rays and blood gas analyses were interpreted as normal. The plaintiffs were treated with oxygen, bronchodilators, and steroids and were then released.[2] Dugas returned to the emergency room the next day complaining of weakness and nausea. The emergency room physician told him to take off work for twenty-four hours. Dugas returned to work the next day. Dawsey was laid off when he told his employer he was unable to work. A few weeks later J.A. Jones lost its construction contract with Conoco; neither plaintiff has worked steadily since then.

Dawsey and Dugas continued to have medical problems which allegedly arose from their exposure to phosgene. Both

plaintiffs filed suit against Olin in Louisiana state court for damages supposedly caused by the exposure. The suits were removed to federal court by Olin and were consolidated for trial. Olin stipulated that it would be liable for any damages caused by phosgene exposure, and the cases went to trial on the issues of whether exposure had occurred and, if so, the amount of damages, if any.

At trial plaintiffs relied on the testimony of several medical doctors to show that they had been severely and permanently injured by their exposure to phosgene. Plaintiffs' first expert medical witness, Dr. Edmond Camp, III, a board certified psychiatrist who first examined the plaintiffs almost two years after the accident, testified that Dawsey's phosgene exposure caused him to have a hormonal deficiency which in turn caused him to be depressed. Dr. Camp further testified that the phosgene exposure caused permanent damage to the part of Dawsey's brain controlling memory formation with the result that Dawsey would have permanent memory impairment. Dr. Camp also testified that Dugas suffered a hormonal deficiency and resulting depression and also incurred memory problems as a result of his exposure to phosgene. In conclusion, Dr. Camp expressed his opinion that the brain damage suffered by the plaintiffs would prevent them from ever returning to their former work.[3]

---

1. The scientific name for phosgene is carbonyl chloride, or $COCl_2$. Phosgene is one of the chemicals used in the process of making toluene diisocyanate, which in turn is used to make urethane foam.

2. Administration of oxygen, steroids, and bronchodilators is the accepted treatment for a person who has or claims to have been exposed to phosgene. Oxygen is administered to make certain that the person is receiving an adequate supply of oxygen, steroids are administered to reduce any lung inflammation that may have occurred, and a bronchodilator is administered to relax the bronchial tubes and enhance the flow of oxygen to the lungs. Such treatment is administered as soon as the patient complains of phosgene exposure and before the physician actually determines whether phosgene exposure actually occurred.

3. When Dr. Camp was asked whether the plaintiffs' reported memory loss could simply be caused by their refusing to tell him they remembered something, Dr. Camp testified that a blood test he administered revealed that the plaintiffs could not have falsified their forgetfulness.

BY THE COURT:

Q What does the blood test tell now?
A Tells whether he is lying or not. We have a blood test for criminals. People that lie and malinger, well we have a blood test called a dopamine beta hydroxylase level.
Q Do you think that is good?
A Yes, sir, it is very accurate. If a person is—
Q Do you mean if the Judge doesn't know who is telling the truth, he can call some-

Plaintiffs' second expert medical witness, Dr. John McCutchen, a neurologist who first examined the plaintiffs over two years after the accident and only three weeks before trial, testified that both plaintiffs suffered from an organic brain syndrome due to phosgene poisoning. Dr. McCutchen explained that an organic brain syndrome involves a structural change in the brain and causes the plaintiffs "disturbance[s] in judgment, in memory, at times in orientation, changes in personality, [and] depression." On cross-examination Dr. McCutchen admitted that the tests performed on the plaintiffs when they were first seen in the emergency room did not prove that they had been exposed to a significant amount of phosgene.[4]

Plaintiffs' third expert medical witness, Dr. Jana Kaimal, a board certified pulmonary disease specialist who saw and treated both plaintiffs shortly after the accident, testified by means of a video tape deposition that he first saw Dawsey eight days after the accident. At that time Dawsey told Dr. Kaimal that he had been exposed to phosgene gas and had passed out for several minutes. Dawsey further related that he suffered aches and pains, nausea, and extreme tightness of the chest the night of the accident. At the time Dawsey first visited Dr. Kaimal, he was still coughing and had shortness of breath on exertion. During his testimony, Dr. Kaimal read the conclusion in the report he prepared for the plaintiffs' attorney on August 20, 1982.

"This is a 31-year-old man, who was exposed to phosgene gas on June 2nd, 1982. He at least lost consciousness temporarily. Since that time, he had developed symptoms suggestive of asthma and allergic rhinitis." That means he had fever type of symptoms.

"As he has no other—no such history before, it is my impression that the disease is related to exposure. I believe the disability resulting from the disease is likely to be long-term. I believe he could work in areas where air is clean and free from fumes. He will incur continued medical care for foreseeable future. If he has developed asthmatic diathesis, this could remain a life-long problem."

Dr. Kaimal further testified that he last saw Dawsey on September 18, 1982, and that Dawsey failed to appear for an appointment scheduled for November 18, 1982. Dr. Kaimal also testified that while Dawsey was capable of earning a living, he should not work in an environment where he would be exposed to dust or airborne chemicals.

Dr. Kaimal testified that when he first examined Dallas Dugas on June 30, 1982, Dugas related that he was coughing and had shortness of breath on exertion and that he had headaches, irritability, insomnia, and some pain in the upper abdomen. Dr. Kaimal further testified that a chest x-ray and lung function done on June 30

body up there and give them a blood test and say, "Boy, that's it"?

A Yes, sir, this test is reasonably accurate and the test is widely accepted in the kind of psychiatry that I do that we have a test to prove malingering and psychopaths and sociopaths.

Q To the best of your knowledge, does that blood test insofar as it relates to truth and untruth, has that been accepted in the courts by anybody?

A I don't know about being in the court system but I ran that test on him and I run it on all my patients and he had a normal level. He is not a malingering or a criminal or anything like that. This test picks up criminals and alcoholics and drug addicts and those sort of people. He is not that way.

MR. VERON: The police need to get a hold of that.

4. Dr. McCutchen testified as follows:

Q Well, Doctor, in short none of those records contains a single bit of evidence that shows an actual exposure to phosgene?

A That's correct.

Q All right. So the first link in the chain is not proven by those records. In fact, to a certain extent even you would admit is disproven by those records?

A I would agree with you, sir, that phosgene doesn't have a way to be proven by the medical examination and these records neither prove it or disprove it.

showed normal, as did a second lung function done on July 12, 1982. Dr. Kaimal also testified that other lung tests conducted in his office after the first two tests indicated that Dugas' lungs were smaller than normal. He stated that he could not explain why Dugas' lungs would test smaller than normal. Dr. Kaimal also stated that he had numerous patients with restricted lungs who lead normal and productive lives.

Plaintiffs' next expert medical witness, Dr. William Coulter, Jr., a board certified internal medicine specialist with a subspecialty in pulmonary disease who examined Dawsey in September 1982 at Aetna's request, testified that he diagnosed Dawsey as having an improving case of chronic bronchitis. Dr. Coulter further testified that while the bronchitis could possibly have been caused by phosgene exposure, it was more likely that his bronchitis was caused by an allergy. Dr. Coulter also testified that Dawsey's condition should not prevent him from working.

Plaintiffs' last expert witness, Dr. Gilles Morin, a psychiatrist who examined Dawsey on September 13, 1984, at Olin's request, testified that, while Dawsey scored a seventy-five on an IQ test and showed a major depressive order with psychosis on the Minnesota Multiphasic Personality Inventory, the clinical evaluation did not bear out these findings. Dr. Morin testified that he thought Dawsey to be of average intelligence and to have a moderate to severe mixed anxiety and depressive reaction rather than to be of borderline intelligence and to have a major depressive order with psychosis. Dr. Morin refused to relate Dawsey's troubles to phosgene and stated that he saw no evidence that Dawsey suffered brain damage from the exposure and that he saw no reason why Dawsey was less capable of earning a living now than he was prior to June 1982. Dr. Morin also testified that patients frequently exaggerate their complaints when they are involved in litigation and that litigation can be the cause of a patient's depression.

Olin's defense consisted of a two-pronged attack on the plaintiffs' case; first, Olin argued that the plaintiffs were exposed to an insignificant amount of phosgene, and, second, that phosgene could not possibly have caused many of the plaintiffs' complaints.

Olin's first expert medical witness, Dr. Robert Jones, a board certified internal medicine specialist with a subspecialty in pulmonary diseases and a professor of medicine at Tulane Medical School who examined Dawsey in March 1982 and Dugas in September 1983, testified about the general effects of phosgene exposure and about the specific effects on the plaintiffs. Dr. Jones testified that phosgene injures persons by inflaming the surface of the moist tissues of the body that are in contact with the phosgene and that phosgene does not get inside the body and do damage to remote parts of the body by toxic action. With respect to Dawsey, Dr. Jones testified that Dawsey has hay fever and that he has no residual disability from having inhaled phosgene on June 2, 1982. Dr. Jones also stated that Dawsey could return to his previous employment if work was available. With respect to Dugas, Dr. Jones testified that Dugas suffers from mild chronic obstructive lung disease caused by twenty-six years of inhaling tobacco smoke. Dr. Jones further testified that Dugas had no current symptoms or impairment that could be attributed to phosgene exposure and that he could perform the strenuous work that he has done all his life.

Olin's second expert medical witness, Dr. Robert Heath, a board certified neurologist and psychiatrist and a professor of medicine at Tulane Medical School, examined the plaintiffs and reviewed their medical records. Dr. Heath testified that he saw absolutely no evidence of a brain injury to Dawsey or Dugas that could be related to phosgene exposure. Dr. Heath further testified that, while Dawsey suffered from moderate depression, the depression was *not physically related to the phosgene ex-posure;* Dr. Heath related the depression

to Dawsey's personality type.[5] Dr. Heath also testified that Dugas suffered mild depression that was not directly caused by phosgene and that Dugas' behavior was typical of that seen when compensation is in the offing.

Olin's third expert medical witness, Dr. Eric Comstock, a board certified medical toxicologist, testified that phosgene does not cause central nervous system damage because phosgene cannot get past the lungs. Dr. Comstock further testified that, based on his review of the plaintiffs' medical records, the plaintiffs did not suffer a significant exposure to phosgene. Dr. Comstock also testified that an exposure to less than twenty-five parts per million minutes[6] of phosgene is considered to be an exposure which is of no health consequence.

Olin also presented the testimony of two other experts, a dispersion analyst and a

---

**5.** Dr. Heath testified as follows about Dawsey's depression:

> Usually people who present with the conversion symptoms are ones who have strong dependency needs. This came out too in his—some of his psychological testing, his strong desires which probably pre-existed. We don't have data on that except for psychological testing to indicate that type of personality and that we can observe clinically.
>
> He represents this type of personality. If you get an event where it is possible to be taken care of without the need to perform, persons who have these strong dependency cravings can readily fall into that and mentally can build up defenses and make it acceptable for them, even though morally or in terms of their own self-esteem they can't admit this to themselves. We have presumed trauma that a great deal of fuss has been made about, that he had a whiff of gas.
>
> The possibility of compensation always aggravates and precipitates symptoms in persons with personalities of that type. That's been known for years by the compensation boards and so on. Even years ago when the British first got their system of compensating for head injuries, they found out that if postconcussion syndrome had a much higher incident in persons who could get compensation than when compensation wasn't a factor.
>
> The exact figures I don't have, but it was around 78% would have post-concussion syndrome after a bump on the head if compensation was in the offing, whereas only 25 or 30% would have post-concussion syndrome if there was no compensation.
>
> Studies of this sort have been done over and over again, and it just increases incidences of disability related to certain people that fall into that; and they are the type with this dependency personality.
>
> I don't think—I mean there is no evidence to indicate that this is a syndrome. It's different than deliberately doing it through malingering.
>
> Q In this case, if I understand what you're saying, the fact that Mr. Dawsey has a lawsuit pending that offers him the prospect of monetary gain has provided him a kind of negative reinforcement, where it's made it more difficult for him to get past his depression?
>
> A This would be a stumbling block that would do essentially that, yes.
>
> Q Doctor, is depression—does depression normally respond to treatment?
>
> A Yes. The results with modern treatment in depression have generally been quite good.
>
> Q So that without the complicating factor of this lawsuit, would you have anticipated Mr. Dawsey to have progressed more than he has?
>
> A You're asking me to speculate, of course. You can't ever know that exactly. I would speculate that probably, yes, he would have progressed more rapidly if that wasn't in the offing.
>
> Q I take it what you're telling us is that you know of no known connection between phosgene and a direct physical cause of depression?
>
> A No. There is no evidence of such a connection in existence to the best of my knowledge and I've researched it as thoroughly as I know how to. If phosgene or any other factor can offer the possibility of compensation, whether it be phosgene or a bump on the head from an automobile accident or something else—we have a real problem with veterans—getting them well—depression. Successful treatment there is much poorer than it is in other services with psychiatric treatment because they can be compensated.
>
> Q As long as they're depressed they're getting money. So, they have no financial incentive to get well?
>
> A That's correct. If you can get compensated for being sick your incidents of sick people are going to go way up.

**6.** The parts per million minutes is calculated by multiplying the parts per million of the gas in the atmosphere times the length of the person's exposure in minutes. For example, an exposure to five parts per million for three minutes would yield an exposure level of fifteen parts per million minutes.

biochemist. The dispersion analyst, Ralph Sklarew, testified that, based on his calculations, the plaintiffs could not have been exposed to more than five to eight parts per million minutes of phosgene. Michael Frosolono, a biochemist involved in pulmonary research, testified that irritation of the eyes, nose, throat, and the upper part of the lungs occurs at a concentration of three parts per million. Frosolono further testified that lung irritation and inflammation will occur at thirty parts per million minutes. Frosolono also testified that the pathological effect of phosgene is limited to the lungs.

After all the testimony and the closing arguments, the court submitted the charge to the jury. The charge asked the following three questions with respect to each plaintiff:

1. Did [plaintiff] inhale the phosgene gas which was released into the atmosphere from Olin's plant on June 2, 1982?

2. Did [plaintiff] sustain damage as a proximate result of inhaling the phosgene gas?

3. How much damage in dollars and cents did [plaintiff] sustain as a proximate result of inhaling the gas?

As to each plaintiff, the jury answered Yes to the first question, No to the second question, and, pursuant to instructions contained in the second question, left the answer to the third question blank. Based on the jury's answers, the court entered judgment for the defendant. The court denied the plaintiffs' and intervenor's[7] motions for new trial and for judgment notwithstanding the verdict. This appeal followed.

## II. ISSUES AND DISCUSSION

Plaintiffs Dawsey and Dugas raise numerous issues on appeal: (1) the trial court abused its discretion in failing to award

damages, (2) the trial court erred in admitting a medical opinion by a nondoctor, (3) the trial court erred in excluding testimony stating that phosgene could cause emphysema which could in turn cause cancer, (4) the trial court erred in not allowing the plaintiffs to cross-examine a medical expert with a certain government publication, (5) the trial court erred in not allowing one of plaintiffs' experts to testify as to the number of deaths and casualties in World War I caused by phosgene, (6) defendant's counsel committed reversible error by asking a witness about prior convictions of one of the plaintiffs, (7) the trial court gave erroneous and misleading instructions about damages, and (8) the trial court erred in not giving plaintiffs' requested charge concerning the relative weight to be given to a treating physician's testimony. Aetna appeals on the ground that the trial court erred by not awarding damages for the compensation benefits Aetna paid to Dawsey and Dugas.

### A.

Plaintiffs' first complaint on appeal is that the trial court "abused its discretion" by not awarding damages. Since the jury and not the trial court was charged with determining whether any damages occurred, and since the trial court merely entered judgment based on the jury's answers, we assume the plaintiffs' complaint is that the trial court erred in not granting plaintiffs' motions for directed verdict and for judgment notwithstanding the verdict and for new trial.[8] We will treat the plaintiffs' first ground of appeal as such.

### 1.

The standard in the trial court for whether to grant a directed verdict or a judgment notwithstanding the verdict is the same.

On motions for directed verdict and for judgment notwithstanding the verdict

---

7. The intervenor Aetna was the workers' compensation carrier on J.A. Jones at the time of this incident and was seeking to recover from Olin compensation benefits it had paid to Dawsey and Dugas. See *infra* part II.I.

8. Plaintiffs' motions for new trial do not raise the issue of the weight of the evidence as a ground for a new trial; however, the plaintiffs' brief in support of the motion does raise the issue; therefore, we will consider the issue raised and address it.

the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc) (footnote omitted). The standard governing directed verdicts and judgments notwithstanding the verdict remains the same on appeal. *Rosenberg v. Trautwein,* 624 F.2d 666, 669 (5th Cir.1980); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 841 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976).

█ Our review of the evidence leads us to the conclusion that reasonable men could reach the conclusion that the jury reached. The various testifying experts offered a wide range of opinions as to whether the plaintiffs were injured by their exposure to phosgene. The jury and not the court of appeals is to weigh the conflicting evidence and decide whether the plaintiffs actually suffered damages. Based on the testimony, the jury could reasonably conclude that the plaintiffs did not suffer a significant phosgene exposure.

The jury's decision that the plaintiffs suffered no damages could have provided us with a potentially troubling problem. While the jury's implicit decision that the plaintiffs suffered no long term effects from the phosgene exposure is amply supported by the evidence, it cannot be said that the plaintiffs did not incur any reasonable expenses due to the phosgene exposure. We believe that the evidence overwhelmingly shows that the phosgene exposure caused the plaintiffs to incur the expense of the initial emergency room visit, and if the jury had denied this element of damages, we would be forced to reverse the trial courts' denial of the motion for judgment notwithstanding the verdict. However, the plaintiffs introduced no evidence concerning these expenses. The only medical expenses the plaintiffs claimed as an element of damages were expenses first incurred over one year after the exposure. The evidence supports the jury's decision that these expenses were not a result of the phosgene exposure. As to all the damages actually finding support in the evidence, there is a substantial conflict in the evidence, and the evidence is not so overwhelmingly in the plaintiffs' favor so that reasonable jurors could not reach a contrary verdict; therefore, we affirm the trial court's denial of the plaintiffs' and intervenor's motions for directed verdict and for a judgment notwithstanding the verdict.

### 2.

█ The plaintiffs' complaint that the trial court abused its discretion in not awarding damages may also be construed as a complaint that the trial court erred in denying the plaintiffs' motions for new trial. We will reverse the trial court's denial of a motion for new trial only when there is a clear showing of an abuse of discretion. *Grenada Steel Industries v. Alabama Oxygen Co.,* 695 F.2d 883, 890 (5th Cir.1983);

*Bunch v. Walter,* 673 F.2d 127, 130 n. 4 (5th Cir.1982). "In order to establish an abuse of discretion the [plaintiffs] must show 'an absolute absence of evidence to support the jury's verdict.'" *Bailey v. Southern Pacific Transportation Co.,* 613 F.2d 1385, 1391 (5th Cir.) (per curiam) (quoting *Urti v. Transport Commercial Corp.,* 479 F.2d 766, 769 (5th Cir.1973)), *cert. denied,* 449 U.S. 836, 101 S.Ct. 109, 66 L.Ed.2d 42 (1980). As discussed in the preceding subsection of our opinion, the record clearly contains evidence to support the jury verdict. We therefore affirm the trial court's denial of the plaintiffs' motions for new trial.

### B.

■ Plaintiffs next complain about the trial court's decision to allow Michael Frosolono, one of Olin's expert witnesses, to testify about the effects of phosgene on humans. Plaintiffs allege that this was error because Frosolono is not a medical doctor. Plaintiffs also rely on a Louisiana statute preventing "unlicensed physicians" from testifying as medical experts.

> Unlicensed physicians shall not be exempt from jury or military duty, or be permitted to collect any fees or charges for services rendered, or be allowed to testify as a medical or surgical expert in any court, or execute public or legal documents as a physician or surgeon, or hold any medical office, or be recognized by the state or parish or municipal corporation as a physician or surgeon; or be entitled to enjoy any of the privileges, rights, or exemptions granted to physicians or surgeons by the laws of this state.

La.Rev.Stat.Ann. § 37:1284 (West Supp. 1985). While we doubt that Frosolono testified as a "medical expert" as that term is used in the Louisiana statute (i.e., Frosolono never expressed an opinion as to how phosgene specifically affected Dawsey and Dugas), we need not concern ourselves with the Louisiana statute because the statute does not apply in federal court; questions concerning the admissibility of evidence in federal court are governed by the Federal Rules of Evidence. *See* Fed.R. Evid. 1101; *Pollard v. Metropolitan Life Insurance Co.,* 598 F.2d 1284, 1286 (3d Cir.1979).

■ Rule 702 of the Federal Rules of Evidence provides the standard for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The trial court's decision to admit expert testimony is within the trial court's discretion and is reviewed at the abuse of discretion level. *Bauman v. Centex Corp.,* 611 F.2d 1115, 1120 (5th Cir.1980); *Branizza v. Greyhound Corp.,* 394 F.2d 33, 35 n. 2 (5th Cir.1968).

■ We find no abuse of discretion in the trial court's decision to admit Frosolono's testimony. Frosolono graduated from college with a double major in biology and chemistry. He then obtained a Ph.D in biochemistry and spent two-and-one-half years as a post-doctoral fellow at the Albert Einstein College of Medicine. After completing his fellowship, Frosolono spent six years as a pulmonary biochemist doing lung research at the Mount Sinai Hospital in Cleveland; he also taught part-time at the Case Western Reserve Medical School during this time. Next, he returned to Albert Einstein where he taught medical students and conducted research in pulmonary biochemistry, pulmonary physiology, and pulmonary cell biology. After six years on the faculty at Albert Einstein, Frosolono left to become a clinical research scientist for a major pharmaceutical company. At the present time he is the acting head of the respiratory section at the company. Frosolono has conducted research on the effects of phosgene exposure on animals and has authored six articles concerning the results of the research.

Frosolono is well qualified to testify about the effects of phosgene on animals and to extrapolate his research to humans. *See Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1136 (5th Cir.1985) (epidemiologist without medical degree competent to testify about the risk of cancer from asbestos exposure and the reduced life expectancy associated with asbestosis). The jury may then decide what weight to give to the testimony. Short of intentionally exposing humans to phosgene, it would be difficult to learn any more about the effects of phosgene than has Frosolono. Frosolono's testimony falls squarely within the intent of rule 702 to allow expert testimony to aid the trier of fact;[9] therefore, we find no error in the trial court's admission of Frosolono's testimony.

### C.

Plaintiffs next take issue with the trial court's decision to delete certain portions of Dr. Coulter's testimony when his deposition was read to the jury. The deleted portions of the deposition contained statements by Dr. Coulter that bronchitis could lead to emphysema which in turn could lead to cancer. Olin objected to these portions of the deposition on the ground that neither plaintiff showed any signs of emphysema or cancer. The trial court sustained the objection.

Dr. Coulter never opined that either Dawsey or Dugas had an increased risk of contracting emphysema or cancer. Dr. Coulter had simply stated that chronic bronchitis, if left untreated, could lead to emphysema which could then lead to cancer. Since there was no evidence that either plaintiff had any signs of emphysema or cancer, the excluded testimony had no bearing on the case. Furthermore, Dr.

Coulter examined only one of the plaintiffs, Dawsey, and stated that, while Dawsey had bronchitis at the time of the examination, the bronchitis was more likely caused by an allergy than by phosgene exposure. Evidence that one condition might lead to another condition does not allow a plaintiff to recover for the second condition, *see Jordan v. Travelers Insurance Co.*, 257 La. 995, 245 So.2d 151, 157 (1971) (plaintiff entitled to recover for prospective damages that are more probable than not); *Koncinsky v. Smith*, 390 So.2d 1377, 1383 (La.Ct. App.1980); therefore, testimony that bronchitis can lead to emphysema is not relevant, *see* Fed.R.Evid. 401, 402, because the testimony, if admitted, would not have allowed the plaintiffs to recover any greater damages. We therefore agree with the trial court's decision to exclude this testimony.

### D.

The plaintiffs next complain about the trial court's refusal to make one of Olin's experts, Dr. Comstock, answer questions as to whether he agreed with statements contained in a government publication. The publication, the National Institute of Occupational Health and Safety (NIOSH) manual issued by the former Department of Health, Education, and Welfare, contains a compilation of summaries of articles. When asked whether he was familiar with the NIOSH manual, Dr. Comstock stated: "I am familiar with it and it is not an authoritative document." Dr. Comstock further stated:

I know better than to rely on second and third class citations of information because I too often have followed up that information and found it was not accurately presented. I will not rely on it. I

---

9. *See* Fed.R.Evid. 702 advisory committee note. Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular

issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore § 1918. *Id.*

don't see any point in my reading what they thought somebody else said.

■ Cross-examination of expert witnesses with statements contained in published articles is permitted by Fed.R.Evid. 803(18) under certain circumstances.

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

(18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Neither Dr. Comstock nor any other witness testified that the NIOSH manual was a reliable authority; therefore, the trial court correctly prohibited plaintiffs from using statements contained in the manual to cross-examine Dr. Comstock. *Hemingway v. Ochsner Clinic*, 608 F.2d 1040, 1047 (5th Cir.1979). Had the plaintiffs desired to cross-examine Dr. Comstock with statements contained in the original articles, they had merely to obtain copies of the original articles and have Dr. Comstock or one of their own numerous experts identify the articles as authoritative. We find no error in the trial court's ruling on this issue.

### E.

Plaintiffs next complain about the trial court's refusal to allow one of plaintiffs' experts, Dr. Goldman, to answer the following question: "Does the literature readily establish that there were literally tens of thousands of soldiers who were actually killed from phosgene in World War I?" The plaintiffs had tendered Dr. Goldman as an expert "in the field of physical organic chemistry with knowledge of the chemical components and composition of phosgene." Dr. Goldman admitted on cross-examination that he was not a toxicologist or a pharmacologist and that he had never done any studies regarding the toxicological effect of phosgene on humans or animals.

■ As previously discussed, *see supra* section II.B, the decision whether to admit an expert's testimony is committed to the trial court's discretion. *Dixon v. International Harvester Co.*, 754 F.2d 573, 580 (5th Cir.1985). We will reverse the trial court's decision only for an abuse of that discretion. *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681, 682 (5th Cir. 1979); *Barnes v. General Motors Corp.*, 547 F.2d 275, 278 (5th Cir.1977). We find no such abuse by the trial court. The question called for the witness to render an opinion about the toxicity of phosgene to humans and about the cause of death of World War I soldiers, two subjects on which the witness was admittedly not qualified. Furthermore, other witnesses for the plaintiff testified about the literature pertaining to the use of phosgene in World War I. We find no abuse of discretion by the trial court and affirm the trial court's ruling on this issue.

### F.

The next alleged error occurred when Olin attempted to question one of plaintiffs' expert witnesses about prior convictions of Dugas.[10] The convictions were for driving while intoxicated and occurred approximately twenty years before the trial. While such questioning would ordinarily be prohibited, Olin asserts that the question was not asked to prejudice the jury but rather to attack the credibility of the plaintiffs' witness. The plaintiffs' witness, Dr. Camp, had testified that he conducted a

10. Since the evidence related to Dugas and not Dawsey, this alleged error is applicable only to Dugas' action.

blood test on Dugas which revealed that Dugas was not a criminal or an alcoholic. *See supra* note 3. Olin sought to challenge the validity of Dr. Camp's test by showing that Dugas was a criminal and possibly an alcoholic. While the question asked by Olin may have been of doubtful relevancy to the cross-examination of Dr. Camp, the plaintiffs have no ground to complain because the objection to the question was sustained; furthermore, the trial court instructed the jury to disregard the question.

 Plaintiffs further contend that the question was so prejudicial that it warranted the granting of a new trial. While we doubt that the jury would be prejudiced against Dugas because he received two driving while intoxicated convictions twenty years ago, we believe that the prejudice, if any, was corrected by the trial court's sustaining of the objection and the instruction to the jury to disregard the question. *See Crown Colony Distributors, Inc. v. United States Fire Insurance Co.,* 510 F.2d 544, 545 (5th Cir.1975). To obtain reversal of the trial court's denial of the motion for new trial based on the alleged improper question about the prior convictions, plaintiffs must show that the trial court abused its discretion.

"An important obstacle to this contention [that the district court erred in not granting a new trial because of the lawyer's prejudicial and inflammatory techniques] is that a motion for new trial is addressed to the sound discretion of the trial judge whose action will not be upset absent a strong and convincing showing of an abuse of discretion." *Crown Colony Distributors,* 510 F.2d at 545 (citations omitted). The trial court is granted such discretion because the trial court is in a better position to determine whether counsel's conduct was actually prejudicial. *Curtis v. Greenstein Trucking Co.,* 397 F.2d 483, 486 (7th Cir.1968). "The general rule is that, unless the conduct of counsel or witnesses is such as to impair gravely the calm and dispassionate consideration of the case by the jury, no error flows from the refusal of the trial court, in the exercise of

its discretion, to vitiate the trial." *Spach v. Monarch Insurance Co.,* 309 F.2d 949, 953 (5th Cir.1962) (citations omitted). We find that the question concerning Dugas' prior convictions did not gravely impair the jury's consideration of the case; we therefore affirm this aspect of the trial court's denial of plaintiffs' motion for new trial.

G.

The plaintiffs next complain that the trial court read the charge to the jury in such a way as to confuse and mislead the jury. In giving its charge, the court instructed the jury in part as follows:

A negligent party, of course, takes the injured party as he finds them. He is liable for all the consequences that flow from the aggravation of a pre-existing condition, even though he did not cause the pre-existing condition, but *you are not to award damages for any injury or condition from which the plaintiff may have suffered or may now be suffering* unless it has been established by a preponderance of the evidence that such injury or condition was proximately caused by the accident in question.

(emphasis added). Several paragraphs later, the court inadvertently began to re-read the same charge:

You are not to award damages for any injury or condition from which the plaintiff may have suffered or may now be suffering—I already read that to you once.

Clearly, the court realized that it was reading part of the instruction that it had previously read to the jury and stopped in the middle of the instruction. We do not believe that the trial court's partial reading of a sentence caused the jury to be misled or confused in any way. The court's comment that it had already read this portion of the charge told the jury to disregard the preceding partial sentence. Furthermore, the partial sentence read by the court does not comport with the rest of the several pages of instructions given by the court concerning damages. We do not believe that the members of the jury would ignore all the

other instructions and focus on one apparently incorrect statement. We reject the plaintiffs' frivolous argument that the trial court's reading of the charge constituted reversible error.

### H.

 The last error urged by the plaintiffs Dawsey and Dugas also involves the charge to the jury. Plaintiffs requested that the court give the following charge concerning the weight to be given to expert medical testimony: "The testimony of the physician who examines and treats the injured party is entitled to much greater weight than that of a physician examining the party at a later date." The trial court did not use the plaintiffs' requested instruction but instead gave the following instruction:

> Now, the rules of evidence provide that scientific, technical or medical knowledge might assist the jury in understanding the evidence and, therefore, we call these witnesses expert witnesses. You should consider each expert opinion received in evidence in the case and give that expert opinion such weight as you think it deserves, including as to when, where and under what conditions the physician may have examined and treated the party.

It is not error to refuse to give a requested instruction, although it may correctly state the law, as long as the substance of the instruction has been adequately covered elsewhere in the court's charge. *Ullman v. Overnight Transportation Co.*, 563 F.2d 152, 157 (5th Cir.1977); *Bolden v. Kansas*

*City Southern Railway Co.*, 468 F.2d 580, 581 (5th Cir.1972). The instruction given by the trial court adequately covers the substance of the instruction requested by the plaintiffs; therefore, we find no error in the trial court's refusal to give the instruction.

### I.

The last asserted error is brought only by the intervenor Aetna. Aetna, as the worker's compensation carrier for the plaintiffs' employer, intervened in the action and sought indemnification from Olin. Louisiana law permits employers compelled to pay compensation benefits to bring a subrogation action against third parties by whose fault the employee was injured. La. Rev.Stat.Ann. 23:1101 (West 1985).[11] Aetna argues that, since the plaintiffs were exposed to phosgene, and since Aetna was compelled to pay compensation benefits to the plaintiffs, it should be able to recover its payments from Olin.

 Aetna's argument ignores the language of section 1101 stating that the third party must be under a "legal liability to pay damages." In this case it was established by the jury's answers to special interrogatories that Olin had no "legal liability to pay damages" because no damages were incurred; thus, Aetna's argument that the trial court erred in not awarding it damages is without merit. *See Usry v. Louisiana Department of Highways*, 402 So.2d 240, 245 (La.Ct.App.), *writs denied*, 404 So.2d 1259 (La.1981) (insurer cannot recover if there is no liability to the insured

---

**11.** Section 1101 provides in full:

When an injury or compensable sickness or disease for which compensation is payable under this Chapter has occurred under circumstances creating in some person (in this Section referred to as third person) other than those persons against whom the said employee's rights and remedies are limited in Section 1032 of this Chapter, a legal liability to pay damages in respect thereto, the aforesaid employee or his dependents may claim compensation under this Chapter and the payment or award of compensation hereunder shall not affect the claim or right of action of the said employee or his dependents, relations, or per-

sonal representatives against such third person, nor be regarded as establishing a measure of damages for the claim; and such employee or his dependents, relations, or personal representatives may obtain damages from or proceed at law against such third person to recover damages for the injury, or compensable sickness or disease.

Any person having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit against such third person to recover any amount which he has paid or become obligated to pay as compensated to such employee or his dependents.

because the right of the insurer to recover is based on the right of the insured to recover); *Paulk v. General Accident Group*, 373 So.2d 599, 601 (La.Ct.App.1979) ("For the right of indemnification to apply, there must be a corresponding right in the employee to receive compensation as a result of the injury in question."). We therefore affirm the trial court's denial of Aetna's motion for judgment notwithstanding the verdict.

## III. CONCLUSION

After carefully reviewing the numerous alleged errors raised by the appellants, we are of the opinion that all of the alleged errors are without merit. The judgment of the district court is AFFIRMED.