**The LOGAN COMPANY and the Travelers Insurance Company, Appellants,**

v.

**Miriam E. AMIC, etc., et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 18, 1972.

Rehearing Denied May 12, 1972.

S. Lloyd Cardwell, Stites & McElwain, Louisville, for appellants.

John Frith Stewart, Segal, Isenberg, Sales & Stewart, Stuart E. Alexander, Louisville, for appellees.

REED, Judge.

The circuit court set aside a decision of the Workmen's Compensation Board that denied workmen's compensation benefits for the disability and subsequent death of John Amic who had asserted a claim against his employer, The Logan Company. Amic died before his claim was finally adjudicated by the board and the proceedings

were revived by his widow as his sole dependent.

The claim was based on the assertion that the employee had contracted leukemia from breathing solvent fumes in the course of his employment. This disease first disabled him and then progressed to the extent that it caused his death. There are incidental questions presented such as which insurer of the employer was liable and whether the appeal from the board's action was timely filed. It is unnecessary to discuss these questions because we have concluded that, based upon the record made before the board, the courts, within the confined limits of judicial review, are not empowered to change the result reached by the board. Therefore, we reverse the judgment of the circuit court.

The deceased employee worked for the employer from February 1967 until he became disabled from leukemia in May of 1969. He later died from that disease in April 1970. The employee was a design and testing engineer. His office and testing room were on the second floor of the employer's plant. A painting area was located on the first floor below him. In the fall of 1967, the employer cut a hole in the second floor in order to gain more height for hoisting equipment over a dipping pit, and it began using a paint called Zincilate with which a solvent called Xylol or Xylene was used as a thinner. This permitted painting by dipping instead of by spray painting. The operation was performed intermittently.

The employee complained that the fumes from the paint made him sick. About five or six weeks after his complaint the employer installed a metal hood over the equipment. The employee advised that this did not eliminate the fumes. The employer then installed a pipe in the hood leading to the outside and installed an exhaust fan to blow the fumes outside. The employee continued to complain about the fumes until the company moved his office into another building in early December 1968.

After his office was moved he did not have to stay in the building in which the painting was performed during the entire day, but he was required to spend some time in the testing room each day for periods that varied from fifteen minutes to three hours. He testified that he could smell the odor of the Xylol in the testing room when the painting operation was performed. He worked fairly regularly until May 1969 and was kept on the payroll through July 1969. The deceased consulted Dr. Giovanni Raccuglia, a specialist in hematology. This physician diagnosed leukemia and instituted treatment, which, for a time, apparently arrested the progress of the disease. Nevertheless, the treatment finally became ineffective and death resulted.

The only evidence presented to the board concerning whether the breathing of the solvent fumes caused the fatal disease was the testimony of Dr. Raccuglia. The board considered this medical evidence and found that it was too speculative and was not sufficient to establish that the deceased employee contracted a compensable occupational disease which arose out of and in the course of his employment. The board relied upon our decision in Miller v. Olin Mathieson Chemical Corporation, Ky., 398 S.W.2d 472 (1965).

The circuit court reversed the board and relied upon the decision made in Johnson v. Stone, Ky., 357 S.W.2d 844 (1962). The Johnson case involved the compensability of a heart attack. Its thesis concerning the determinative significance of medical evidence was re-examined in the cases of Inland Steel Company v. Johnson, Ky., 439 S.W.2d 562 (1969) and Hudson v. Owens, Ky., 439 S.W.2d 565 (1969). In Hudson we said that the Stone case did not squarely confront us with the proposition as to whether or not uncontradicted medical evidence was absolutely binding on the board concerning the issue of causation in heart-attack cases. In Inland Steel v. Johnson, supra, we pointed out that substance should

prevail over form and a physician's testimony should be examined in its total meaning rather than word by word. Both Inland Steel and Hudson approved the fundamental approach set forth in Lee v. International Harvester Co., Ky., 373 S. W.2d 418 (1963). The rule of Lee is that, if the board finds against the claimant, judicial review as to factual findings is confined to a determination of whether the claimant's evidence was so strong as to compel a finding in his favor—so persuasive that it was clearly unreasonable for the board not to be convinced by it.

Miller v. Olin Mathieson Chemical Corporation, Ky., 398 S.W.2d 472 (1968), was decided after the Stone case and relied upon the Lee case. The Miller case involved a claim for compensation for the death of a worker as the result of leukemia. There was medical evidence of his exposure to chemicals during the course of his work. A noted hematologist testified that in his opinion the death of the worker was caused by exposure to chemicals during his employment. There was contrary medical evidence to the effect that the cause of leukemia remains unknown. We held that the claimant's evidence was not so clear-cut and convincing that we could conclude that the board, in disallowing the claim, had acted erroneously as a matter of law.

Although Dr. Raccuglia expressed his opinion in the language of probability, he nevertheless conceded that medical science does not yet really know what causes leukemia. He also conceded: "There is not direct proof for either Benzene or Xylol to be the cause of leukemia." He also stated that Xylol was "less toxic" than other chemicals under suspicion. It is perfectly apparent, when this physician's testimony is considered in its entirety, that Dr. Raccuglia firmly believed decedent's death was caused by breathing Xylol fumes. If the board as the fact finder had been persuaded by this evidence, such finding could well have withstood the test of judicial review. In its expression of probability from a qualified witness, it could have then been regarded as substantial evidence in support of the board's finding.

The problem before us, however, is whether the medical testimony, conceding that it is uncontradicted by contrary evidence, when considered as a whole, is so clear and positive that any reasonable, objective fact finder should be compelled to accept it. Whether uncontradicted medical testimony attains that status must be a question of degree. It must be considered in its entirety and not in bits and pieces.

When the total testimony of Dr. Raccuglia is considered, his opinion appears to constitute more a hypothesis than a theory; his concessions concerning the state of accepted medical knowledge on the subject of causation of leukemia in general and the status of Xylol in particular demonstrate a retreat from a willingness to theorize in the scientific sense. Although we should not require uncontradicted medical testimony to demonstrate an axiom in order to compel a finding, most legal thinking would require such opinion to rest upon higher ground than hypothesis before a court should say that a reasonable, objective fact-finding body, whether a jury or an administrative board, was compelled to accept it. We are of the view that the board was not compelled to accept Dr. Raccuglia's conclusion concerning causation in this case.

The judgment is reversed with directions to enter a new judgment confirming the order of dismissal entered by the board.

All concur.