**CERTAIN–TEED PRODUCTS CORPORATION and Travelers Insurance Company, Appellants,**

v.

**Freddie MITCHELL, James R. Yocom, Commission of Labor and Custodian of the Special Fund and Workmen's Compensation Board, Appellees.**

Court of Appeals of Kentucky.

June 16, 1978.

Discretionary Review Denied
Jan. 9, 1979.

Boyd F. Taylor, Hamm, Taylor, Milby & Farmer, London, for appellants.

Stephen C. Cawood, Pineville, for appellee, Freddie Mitchell; Cawood Smith, Smith & Carter, Harlan, of counsel.

John Riehl, Jr., Ronald C. Bakus, Dept. of Labor, Louisville, Kenneth E. Hollis, Gen. Counsel, Dept. of Labor, Frankfort, for James R. Yocom, Commissioner of Labor and Custodian of the Special Fund.

Before GANT, HOWARD and HOWERTON, JJ.

HOWARD, Judge.

This is an appeal from the Laurel Circuit Court which affirmed the Opinion and Award of the Workmen's Compensation Board finding the claimant, Freddie Mitchell (hereinafter referred to as Mitchell), to be permanently and totally occupationally disabled as the result of the disease aplastic anemia, secondary to exposure to some toxic agent. The Board found that Mitchell was exposed to the hazards of the disease while in the employment of Certain-Teed Products Corporation (hereinafter referred to a Certain-Teed). The Board apportioned sixty percent (60%) of the award against Certain-Teed and forty percent (40%) against the Special Fund.

Certain-Teed and the Special Fund argue that there was insufficient evidence to sustain the Board's finding that the disease Mitchell suffers from is work-related.

In one respect, this is a case of first impression in this Commonwealth as this particular disease has not appeared in any occupational disease claim before.

Mitchell started working as a maintenance man for Certain-Teed in March of 1974. Certain-Teed is a manufacturer of sound-deadening insulation for automobiles. As part of the process, fiberglass materials are treated with certain chemicals and baked in ovens. As a result of his job, Mitchell testified that he came into contact with these chemicals, some containing benzene, used at the plant. He testified that the powdery chemicals covered parts of the machinery he had to repair, and that he bathed every night to remove dust which settled on his body. Mitchell's prior work experience included employment at gas stations, where he had pumped gas and come into contact with other hydrocarbons.

Mitchell was given a pre-employment physical, including a chest x-ray, by the Certain-Teed company doctor, and was cleared for work. About a week after he started working, Mitchell cut the tip of his finger. This injury was treated by the company doctor, and Mitchell lost no time off from his job as a result thereof. Approximately four months after he started

working, Mitchell cut his elbow on the threads of a machine he was repairing. The elbow became severely infected, and he was referred by the company doctor to the University of Kentucky Medical Center. Mitchell was treated there by several doctors, including Dr. John J. Hutton, Jr., a hematologist, who diagnosed him as having aplastic anemia.

Aplastic anemia is a very rare disease, afflicting about one (1) in three hundred thousand (300,000) people. It is a disease affecting the bone marrow which produces the cells in the blood. The bone marrow contains fewer cells than normal; likewise, the blood cell count is lower than normal. The lower blood cell count (red cell, white cell, and platelet count) results in a reduced resistance to disease and infection, and reduced coagulation with cuts, therefore resulting in freer bleeding. A person is also less energetic. There is no cure; however drugs can be used in an attempt to raise the bone marrow count. The overall mortality rate in adults who contract this disease is sixty-five to seventy-five percent (65–75%) and the median survival time is about three (3) months.

The drugs used on Mitchell did not significantly increase his bone marrow count. He developed pneumonia and thereafter an abscess in his lungs. Part of one lung was removed.

The Board, in its Opinion and Award, quoted this statement made by Dr. Hutton:

It was my opinion, based upon my reading and my experience with patients with the disease, that the type of history Mr. Mitchell had is typical of the sort of history that is accepted as causative with reasonable medical certainty.

Certain-Teed argues that, in most diagnosed cases of aplastic anemia, the cause is ideopathic (unknown). The company also argues that even when it was shown that the patient had been exposed to a toxic agent, it was not established that such toxic agents were the cause of the disease, but instead merely associated with the patient's past history. Certain-Teed argues that there are too many assumptions in the above-quoted statement, and therefore there is not substantial evidence to support the Opinion and Award of the Board.

Dr. Hutton's testimony is likewise to the effect that the cause of aplastic anemia in certain individuals is ideopathic. However, there is a much more frequent occurrence of the disease in people with industrial exposure to certain toxic agents, including benzene. The doctor stated that it is difficult to pinpoint specific agents; however, toxic exposure, when found, is assumed to be the first probable cause.

The rarity with which the disease occurs results from the fact that some people with the same or similar amount of exposure will develop the disease, whereas others will not. Dr. Hutton also assumed, for a variety of medical reasons, that Mitchell did not have the disease when he went to work for Certain-Teed. Dr. Hutton's opinion, within reasonable medical certainty, was that Mitchell's exposure to a toxic agent while working for Certain-Teed caused the development of the disease aplastic anemia.

The testimony of Walter E. Davis, M.D., who examined Mitchell at the request of Certain-Teed, was to the effect that Mitchell was not suffering from aplastic anemia at that time. Dr. Davis' diagnosis was a bone marrow abnormality with peripheral manifestations of anemia and granulocytopenia. His testimony was that Mitchell's condition was compatible with recovering aplastic anemia, chemical or drug injury to the marrow, radiation injury of the marrow or pre-leukemia.

Dr. Davis also testified that the exact cause of aplastic anemia is unknown; however approximately one-fourth of the patients in which the disease is found have in their history an exposure to a drug or chemical which, in the past, has been associated with the development of aplastic anemia in higher numbers than those who develop the disease without similar exposure.

Certain-Teed argues that it was not shown conclusively that any exposure leading to the development of the disease occurred while Mitchell was working for it.

Certain-Teed states that not only are most cases diagnosed as having an ideopathic cause, but also that Mitchell had come into contact with benzene and other hydrocarbons when he worked at gas stations, some four (4) years prior to his affliction with the disease. Dr. Davis testified that it is possible that an exposure to a toxin at a service station four years prior thereto could possibly be related to the development of aplastic anemia.

However, Dr. Hutton's testimony was that the major percentage of patients with toxic exposure will develop the disease within a period of eight months, and generally the closer the time of development of the disease within that time frame, to the exposure, the more likely that exposure is the cause.

*Larson's Workmen's Compensation Law,* Volume 1–A, Section 41.70 contains a summary of the continuing expansion of occupational diseases held to be covered under applicable Workmen's Compensation Statutes.

And in *Princess Manufacturing Company v. Jarrell,* Ky., 465 S.W.2d 45, 48 (1971), the court holds that a claimant could prove that he is suffering from an occupational disease by a showing of a direct causal relationship between work conditions and a particular disease contracted by a single individual, therefore not requiring a showing that there is something about the occupation which would tend to cause the disease in all employees. The claimant, Jarrell, was held to be occupationally disabled after she suffered urticarial hives as the result of her allergic reaction to fabrics used in the manufacture of garments by her employer.

■ The rarity of the disease aplastic anemia, and any peculiarity of Mitchell in contracting the disease, as compared to other workers, would not bar his claim if the disease can be shown to be work-related.

■ We feel that the Board's finding that Mitchell was permanently and occupationally disabled, as the result of an occupational disease contracted while in the employ of Certain-Teed, is supported by substantial evidence of probative value and same will not be disturbed. CR 52.01.

■ There was little medical testimony as to apportionment; however, the concept of an occupational disease caused by exposure to a toxic agent is new to this Commonwealth and to the Board. Based on the medical proof presented, we do not feel that the Board erred in apportioning the liability for the award between Certain-Teed and the Special Fund on a 60/40 basis.

The judgment of the trial court is affirmed.

ALL CONCUR.