Clois OSBURN and Anita Osburn,
Plaintiffs-Appellees,

v.

ANCHOR LABORATORIES,
INC., Defendant,

Rachelle Laboratories, Inc.,
Defendant-Appellant.

No. 86–1094.

United States Court of Appeals,
Fifth Circuit.

Aug. 28, 1987.

G. Luke Ashley, Thompson & Knight, Dallas, Tex., for defendant-appellant.

Dale D. Williams, Rod S. Squires, Williams, Pattillo & Squires, Waco, Tex., for plaintiffs-appellees.

Before WISDOM, RUBIN, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

In this Texas law diversity case, plaintiffs-appellees Clois Osburn and Anita Osburn (Osburns) sued Anchor Laboratories, Inc. (Anchor) and Rachelle Laboratories, Inc. (Rachelle) for personal injuries under negligence and strict products liability theories. The Osburns alleged that due to the defendant drug manufacturers' failure to warn Mr. Osburn of the dangers to persons administering veterinary chloramphenicol and their failure to give him adequate instructions for its use, Mr. Osburn contracted leukemia. Answering special interrogatories, the jury found the defendants liable under both theories. The district court entered judgment on the verdict in favor of the Osburns. Rachelle appeals, claiming that federal law preempts the Osburns' tort claims for failure to warn, that the "learned intermediary" doctrine absolved it of any duty to warn Mr. Osburn directly, that the Osburns failed to prove causation, and that newly discovered evidence and an excessive damages award require a new trial; or, alternatively with respect to the excessiveness complaint, a remittitur.

**Facts and Proceedings Below**

When Clois Osburn was diagnosed as having leukemia, he was forty-two years old. For almost the entirety of his adult life, he had worked as a cowboy in the Texas panhandle, often caring for sick cattle and horses. In September 1982, Osburn obtained from Dr. Swain a prescription for veterinary chloramphenicol oral solution, which he immediately began administering daily to the sick calves he was caring for. Over the following eighteen months, he used ten to thirteen cases of chloramphenicol, each containing six sixteen-ounce bottles of the antibiotic. Of this total, two or three cases consisted of chloramphenicol produced by Anchor and the other eight to ten cases were of Mychel-Vet, the brand name for Rachelle's version of the drug.

Since the chloramphenicol came in plastic capped bottles into which a needle could not be inserted, each morning Osburn poured several bottles of the drug from their original bottles into other, same sized bottles with injectable rubber lids. These he carried in a medicine bag on his horse's saddle to pastures where the calves grazed. To administer the drug, Osburn straddled the sick animal, inserted a syringe into the rubber lid of a bottle containing chloramphenicol, filled it, and injected the calf with a 60cc syringe-full dose of the drug. In the process of filling the syringe, chlorampenicol leaked from previously-made syringe holes in the rubber lid. The chloramphenicol often ran down Osburn's hand and arm, getting into scratches and cuts on his arm. Osburn recalled that on one occasion so much of the drug got into a rope burn on his arm that he could taste its bitterness in his mouth. Osburn wore leather gloves on the job, and testified that by the end of each day the gloves were soaked through with chlorampenicol.

In February 1984, Osburn visited his family physician (Dr. Harlow), who detected a large knot near Osburn's spleen. Dr. Harlow hospitalized Osburn, performed tests, and tentatively diagnosed Osburn's condition as leukemia. Later that month Osburn underwent further tests, including a bone marrow biopsy, at the direction of oncologist Dr. Karim Nawaz. On February 28, 1984, Dr. Nawaz confirmed Dr. Harlow's diagnosis of leukemia, giving Osburn the specific diagnosis of chronic myelogenous leukemia. The doctors informed Osburn that from the date of diagnosis he could expect to live two to five years.

On August 8, 1984, the Osburns filed this suit against Anchor and Rachelle. Subsequently, Anchor and Rachelle filed cross-claims against each other for contribution. The defendants then impleaded Dr. Jack Swain, the veterinarian from whom Osburn obtained the chloramphenicol, demanding indemnity and contribution. Shortly before

trial, the Osburns reached a settlement agreement with Anchor and Dr. Swain.[1]

The Osburns tried their case against Rachelle on December 2–6, 1985. Rachelle's motion for directed verdict at the close of all the evidence was denied. Answering special interrogatories, the jury found that Rachelle had failed to provide adequate warnings to Mr. Osburn regarding the risk of fatal blood disorders from absorption of chloramphenicol, that this failure was a producing (and proximate) cause of Osburn's leukemia, and, therefore, that Rachelle was liable under both strict products liability and negligence theories. Pursuant to the district court's instruction that if it found Rachelle liable, then as a matter of law Anchor was also liable, the jury apportioned causation at eighty-five percent attributable to Rachelle and fifteen percent attributable to Anchor. The jury awarded $2,500,000 damages to Clois Osburn and $500,000 damages to Anita Osburn. The district court entered judgment for the Osburns against Rachelle, awarding all damages minus the fifteen percent attributable to Anchor. Rachelle moved for judgment notwithstanding the verdict, and for new trial or, alternatively, a remittitur. The district court denied these motions and this appeal followed.

## Discussion

### I. Preemption

#### A. Preemption principles

Preemption doctrine finds its roots in the supremacy clause of the Constitution, which mandates that federal law shall be the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. The Supreme Court has long interpreted this clause to authorize Congress to enact laws under its enumerated powers that preempt state laws governing the same subject. *Gibbons v.*

*Ogden*, 22 U.S. (9 Wheat.) 1, 210–11, 6 L.Ed. 23 (1824). State common law as well as state statutes and regulations can be preempted by federal law. *See, e.g., Chicago & N.W. Transp. Co. v. Kalo Brick & Title Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981).

■ Preemption occurs in two general contexts. When Congress evidences, either expressly or inferentially through the comprehensiveness of the federal regulatory scheme, an intent to totally occupy a given field, state law falling within that field is preempted. Alternatively, even if Congress has not entirely displaced state regulation in an area, any state law that actually conflicts with federal law is preempted. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), *or* where state law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 401, 85 L.Ed. 581 (1941), *quoted in Silkwood*, 104 S.Ct. at 621.

#### B. Rachelle's argument

■ In this case, Rachelle argues that the Food, Drug and Cosmetic Act (FDCA),[2] 21 U.S.C. §§ 301–392, and the Food and Drug Administration's (FDA) implementing regulations governing veterinary prescription drug labeling, *see* 21 C.F.R. §§ 201.-105, 514.1–514.8, preempt the Osburns'

---

1. Pursuant to the settlement agreement, Anchor paid the Osburns $225,000 in exchange for a release of all their claims against it. Although the Osburns had not formally brought any claims against Dr. Swain, he also paid them $50,000 in exchange for a full release. Upon motion by Rachelle, the district court then realigned Anchor as a third-party defendant. Anchor was unrepresented at trial and did not actively participate in the proceedings.

2. The FDCA is a criminal statute that makes unlawful the manufacture, sale, and marketing in interstate commerce of "misbranded" drugs. *See* 21 U.S.C. § 331. It authorizes government seizure and condemnation of such drugs. *Id.* § 334. The definition of "misbranding" is set forth in 21 U.S.C. § 352, which sets forth drug labeling requirements and provides that drugs with labels that violate any of the requirements will be deemed misbranded.

state common-law tort claims based upon failure to warn. According to Rachelle, a direct conflict exists between the FDCA and the Osburns' tort claim under Texas law because it is impossible for Rachelle to comply with both the FDA labeling requirements and the state law duty to warn.[3] Rachelle bases this argument on an FDA regulation, 21 C.F.R. § 201.105, which in the case of veterinary chloramphenicol requires, as part of the manufacturer's new animal drug application, a label approved by the FDA. Specifically, Rachelle argues that because the FDA regulation required it to use an FDA-approved label in order to escape criminal liability under the FDCA for dispensing a "misbranded" drug, it could not simultaneously comply with Texas tort law obligations that presumably mandated more extensive warnings than those provided in Rachelle's FDA-approved chloramphenicol label.

We find this argument unpersuasive in the present context. Unlike the FDA regulations for some products, the regulations pertaining to veterinary chloramphenicol did not set forth a particular mandatory label. Instead, the regulations required Rachelle to submit a proposed label of its own choosing, which the FDA would then approve or reject. *See* 21 C.F.R. Part 514 (New Animal Drug Applications); *id.* § 514.2(b)(3)(iii). Of special significance is the fact that the FDA regulations specifically permitted Rachelle to add additional warnings to a previously approved label as soon as it became aware of the necessity to do so—without any need to first obtain FDA approval of the supplemental warnings. 21 C.F.R. § 514.8.[4] The FDA regulations thus did not prevent Rachelle from adding to its label warnings of the dangers of fatal blood diseases associated with exposure to chloramphenicol as soon as it learned of such dangers.[5] We therefore

3. Rachelle does not contend, however, that the FDCA reflects, expressly or by implication from comprehensiveness, any congressional intent to supersede totally state common-law tort claims for injuries resulting from a drug producer's failure to warn of a drug's dangerous propensities, and we have found no such intent. *Accord Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374 (1984) (FDCA and FDA regulation of prescription drug labeling held not to preempt state tort action for failure to warn adequately of dangers of tetracycline use); *see also Silkwood,* 104 S.Ct. at 622–26 (Atomic Energy Act does not preempt state tort law remedies); *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 93 S.Ct. 1590, 1597, 36 L.Ed.2d 280 (1973) (Water Quality Improvement Act does not preempt state common-law claims for damages for oil spillage); *Ferebee v. Chevron Chem. Co.,* 736 F.2d 1529, 1539–43 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984) (though Congress, in the Federal Insecticide, Fungicide, & Rodenticide Act, 7 U.S.C. §§ 136–136y, has precluded states from directly regulating the content of pesticide labels, state damage actions in tort based on the theory that the pesticide was inadequately labeled are not preempted); *Palmer v. Liggett Group, Inc.,* 633 F.Supp. 1171 (D.Mass.1986) (mandatory exclusive cigarette label warnings of Federal Cigarette Labeling & Advertising Act, 15 U.S.C. §§ 1331–1341, held not to preempt state tort actions for failure to warn). *See also Grocery Mfrs. of America, Inc. v. Gerace,* 755 F.2d 993 (2d Cir.), *cert. denied,* 474 U.S. 820, 106 S.Ct. 69, 88 L.Ed.2d 56 (1985); *Cosmetic Toiletry & Fragrance Ass'n v. State of Minnesota,*

440 F.Supp. 1216 (D.Minn.1977), *aff'd,* 575 F.2d 1256 (8th Cir.1978).

4. Once the FDA approves a drug manufacturer's application to market an animal drug, 21 C.F.R. § 514.8 allows the manufacturer to propose changes in the terms of its application by submitting a "supplemental new animal drug application." Although section 514.8 generally precludes the manufacturer from placing proposed changes into effect prior to formal FDA approval of the supplemental application, subsections (d) and (e) expressly exempt from this requirement changes to package labeling to provide additional warnings:

"(d) Changes of the following kind proposed in supplemental new animal drug applications should be placed into effect at the earliest possible time:

"(1) The addition to package labeling, promotional labeling, and prescription drug advertising of additional warning, contraindication, side effect, and precaution information.

"....

"(e) The Food and Drug Administration will take no action against a new animal drug or applicant solely because changes of the kinds described in paragraph (d) of this section are placed into effect by the applicant prior to his receipt of a written notice of approval of the supplemental new animal drug application if [certain notice and consistency] conditions are met."

5. *Accord Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374, 390 (1984) (reaching same conclusion in context of human antibiotic tetracycline). *But cf. Hurley v. Lederle Labora-*

conclude that federal law neither made it practically (nor legally) impossible, nor would it have posed an obstacle to accomplishing the objectives of the FDCA, for Rachelle to give warnings that would have satisfied its duty under Texas law. Since Rachelle has not convinced us that the FDA regulations actually conflict with its duty to warn under Texas law, or that Congress intended to exclusively occupy the field presented by the Osburns' claims, we reject Rachelle's preemption challenge.

## II. Scope of Rachelle's Duty to Warn

■ Rachelle's second argument is that the district court erroneously instructed the jury that Rachelle had a duty under Texas law to warn "lay users," such as Osburn, of the dangers associated with chloramphenicol. According to Rachelle, since veterinary chloramphenicol is a "prescription drug" (*i.e.*, a drug available only from veterinarians), under the "learned intermediary" doctrine Rachelle's duty to warn ran only to the prescribing veterinarian. This doctrine, recognized by Texas courts, provides that "when a [prescription] drug manufacturer properly warns a prescribing physician of the dangerous propensities of its product, the manufacturer is excused from warning each patient who receives the drug." *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 591 (Tex. 1986); *see also Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1275–76 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Gravis v. Parke-Davis & Co.*, 502 S.W.2d 863, 870 (Tex.Civ.App.— Corpus Christi 1973, writ ref'd n.r.e.). The manufacturer's duty is satisfied because the doctor is expected to be a "learned intermediary," communicating between the manufacturer and the consumer. *Koonce v. Quaker Safety Prods. & Mfg. Co.*, 798 F.2d 700, 717 (5th Cir.1986); *Reyes*, 498 F.2d at 1276. However, as the Texas Supreme Court has recently emphasized, the "mere presence" of an intermediary does

not excuse the manufacturer of its duty to warn ultimate users; "[t]he issue in every case is whether the original manufacturer has a reasonable assurance that its warning will reach those endangered by the use of the product." *Alm*, 717 S.W.2d at 591.

We do not think Texas courts would apply this doctrine in the case before us. In the prescription drug context, the rationale underlying the learned intermediary doctrine is that by virtue of his medical expertise, a physician has knowledge not only of the dangerous propensities of drugs, but also of the particular "susceptibilities of his patient[s]." *Reyes*, 498 F.2d at 1276. The doctrine therefore applies to some extent because the doctor, armed with such knowledge, is able to make an informed choice about whether to prescribe a drug to a particular patient and about what risks should be communicated to that patient.

Although a veterinarian receives training in pharmacology, his "patients" are animals rather than humans. A veterinarian, therefore, can be expected to have knowledge of the particular susceptibilities of the *animals* he treats, or of *animals* generally, but not of those of persons, by definition not under his care, either in general or who happen to obtain from the veterinarian a prescription drug to be used in treatment of an animal. Hence, it may have been reasonable for Rachelle to expect Dr. Swain to have particular expertise and knowledge concerning the dangers *to animals* involved in the use of chloramphenicol and thus to communicate those dangers to persons who will directly administer the drug to an animal. But it seems unreasonable to expect a veterinarian such as Dr. Swain to have the medical expertise necessary to make him in all instances a "learned" intermediary with regard to dangers to *humans* who are exposed to a drug in the process of administering it to animals.[6] At least this is so where, as here,

tories, 651 F.Supp. 993 (E.D.Tex.1986) (holding tort claim for failure to warn of dangers associated with DPT vaccine preempted by FDA regulations that prohibited manufacturer from using or changing label or package insert without prior FDA approval, *see* 21 C.F.R. § 601.12).

**6.** *Cf. Haste v. American Home Prods. Corp.*, 577 F.2d 1122 (10th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978) (manufacturer satisfied duty by warning prescribing veterinarian of health risks to *animals* vaccinated by their owners with its prescription vaccine).

the drug is properly dispensed for subsequent use by animal owners away from the direct supervision of the prescribing veterinarian.[7] We therefore reject Rachelle's argument that the learned intermediary doctrine should apply and, consequently, its challenge to the district court's instructions regarding the scope of Rachelle's duty to warn.

### III. Sufficiency of Causation Evidence

#### A. Standard of review

■ Another of Rachelle's arguments is that the testimony offered by the Osburns' medical experts was legally insufficient to support the jury finding that Mr. Osburn's leukemia was caused by his exposure to chloramphenicol.

Even though this is a diversity case, a federal rather than a state law standard governs the determination whether sufficient evidence was presented to defeat a motion for directed verdict. *See Boeing Co. v. Shipman*, 411 F.2d 365, 368–69 (5th Cir.1969) (en banc). Under the *Boeing* standard, a federal court is required to look at all the evidence presented, to view it in the light most favorable to the nonmoving party, and to draw all reasonable inferences in that party's favor. *Id.* at 374. The motions should be denied if "substantial evidence" opposes them, "that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* Therefore, unless the evidence pointed so strongly and overwhelmingly in favor of Rachelle that reasonable persons could not arrive at a contrary verdict, the district court was obligated to deny Rachelle's motions. On appeal we apply the same standard. *See, e.g., Daw-*

*sey v. Olin Corp.*, 782 F.2d 1254, 1261 (5th Cir.1986).

#### B. Causation evidence

Rachelle acknowledges that chloramphenicol is known to produce toxic effects on blood, including suppression of blood-forming activity in the bone marrow (aplastic anemia) and uncontrollable growth of abnormal blood cells (leukemia). Rachelle contends, however, that available scientific data has shown that chloramphenicol causes leukemia only where it has first caused aplastic anemia. In this case, Osburn was never diagnosed as having aplastic anemia, but approximately eighteen months after he began administering chloramphenicol to cattle, he received a diagnosis of chronic myelogenous leukemia. From this absence of a diagnosis of aplastic anemia, Rachelle draws the conclusion that Osburn did not have the disease and, therefore, that since there is no generally accepted theory in the medical community that chloramphenicol can cause leukemia without first causing aplastic anemia, there was insufficient evidence that exposure to chloramphenicol caused Osburn's leukemia.

■ After reviewing the record in the light most favorable to the Osburns, as *Boeing* requires, we conclude that reasonable persons could find that exposure to chloramphenicol caused Osburn's leukemia. The evidence reflected that Osburn had been in good health until shortly before his initial 1984 leukemia diagnosis and had no known exposure to other agents thought to be possible causes of leukemia. July 1980 blood tests were normal. The Osburns presented two well-qualified medical experts who testified at length about causation.[8] These physicians, Dr. Benowitz and

7. The situation here is perhaps distinct from one where a veterinarian personally administers a drug to an animal, and a danger exists to persons expected to come in contact with the animal. In this latter context, the veterinarian at least controls exposure to the drug by his patient, the animal. The veterinarian then has only to communicate dangers running from the animal he treated to persons exposed to the animal. We likewise do not speak to the situation where an employee of the veterinarian comes into contact with the drug while administering it to animals in the course of his employ-

ment pursuant to the prescription and under the general supervision of the veterinarian. The types of cases mentioned in this footnote are not before us, and we intimate no view as to any of them.

8. The Osburns' principal experts concerning causation were Dr. Neil Benowitz and Dr. Eric Comstock. Dr. Benowitz is chief of the Clinical Pharmacology and Experimental Therapeutics Division of the University of California School of Medicine in San Francisco. He also heads the Adverse Drug Reaction Surveillance Com-

Dr. Comstock, testified that, in their opinion, chloramphenicol-induced leukemia need not be preceded by aplastic anemia. Both doctors also gave the opinion that, to a reasonable degree of medical certainty, Osburn's leukemia was caused by his exposure to veterinary chloramphenicol.[9]

Rachelle does not challenge the qualifications of these experts nor the admissibility under the Federal Rules of Evidence of their opinions about causation. Rachelle merely argues that because the notion that chloramphenicol can cause leukemia without first causing aplastic anemia has not been widely accepted in the medical field, the opinions of the Osburns' experts that Mr. Osburn's leukemia was caused by exposure to chloramphenicol provide insufficient evidence of causation.

■ This argument misses the point. An expert's opinion need not be generally accepted in the scientific community before it can be sufficiently reliable and probative to support a jury finding. *See Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 744–45 (11th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1535 (D.C.Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *Marder v. G.D. Searle & Co.*, 630 F.Supp. 1087, 1093–94 (D. Md.1986). What is necessary is that the expert arrived at his causation opinion by relying upon *methods* that other experts in his field would reasonably rely upon in forming their own, possibly different, opinions, about what caused the patient's disease. *See generally* Fed.R.Evid. 703; *Barrel of Fun, Inc. v. State Farm Fire & Cas. Co.*, 739 F.2d 1028 (5th Cir.1984). Thus, medical expert opinion testimony that is controversial in its conclusions can support a jury finding of causation as long as the doctor's conclusory opinion is based upon well-founded methodologies. *Ferebee*, 736 F.2d at 1535.[10]

■ The medical experts' opinions in this case meet this requirement. In reaching the opinion that Osburn's exposure to chloramphenicol caused his leukemia, the Osburns' medical experts relied upon their particular areas of expertise, the characteristics of Mr. Osburn's individual case, as presented in his medical records, and scientific studies and case histories reported in the generally accepted medical literature that suggested an association between chloramphenicol and blood disorders, in-

mittee for Northern California, which oversees diagnosis and management of drug toxicities and adverse reactions throughout that region. His primary research area is toxicology, which is the diagnosis and study of the toxic effects of drugs or chemicals on the human body. He has authored numerous book chapters and articles in this area, although his research has not specifically involved the drug chloramphenicol. He is board certified in internal medicine and medical toxicology. Since 1974 he has also served as assistant chief of the Clinical Pharmacology-Toxicology Unit at the San Francisco General Hospital Medical Center, and in this capacity is commonly called upon to analyze possible drug-induced diseases and other drug reactions in patients. Dr. Benowitz has also on several occasions been retained by the Federal Workers' Compensation Board specifically to analyze possible cause and effect relationships between drugs and blood diseases, including benzene-induced leukemia. Dr. Comstock is a board-certified medical toxicologist and an assistant professor of medicine at the Baylor College of Medicine in Houston, Texas. He is a licensed, practicing physician with a previous M.A. in biochemistry. Since 1972, he has also been an adjunct professor of pharmacology at the University of Texas Medical School. Dr. Comstock has done extensive research on toxic effects of chemicals, particularly asbestos-based substances.

9. Moreover, Dr. Benowitz testified that it was entirely possible that Osburn had suffered from aplastic anemia prior to being diagnosed with leukemia. Since Osburn saw no doctor between the time he started handling chloramphenicol and the time he received the leukemia diagnosis eighteen months later, Dr. Benowitz believed he could easily have suffered from chloramphenicol-induced aplastic anemia during the interim. Dr. Benowitz's testimony thus contradicts Rachelle's assumption that Osburn's leukemia was not in fact preceded by aplastic anemia.

10. We do not suggest that this approach be carried to extremes—to, for example, the denial of gravity or the like. But nothing remotely of that kind is involved here. Nor are we in the area of pure theoretical speculation. Rather, this case involves a situation where science has some meaningful information but scientific "truth" has not so completely hardened as to prevent legitimate difference of true expert opinion in a particular concrete context.

cluding leukemia.[11] These are methodologies concededly relied upon generally by physicians in diagnosing etiology of a particular patient's disease. *See, e.g., Wells,* 788 F.2d at 744–45; *Ferebee,* 736 F.2d at 1535–36.

Rachelle of course introduced its own experts, who were of the view that Mr. Osburn's leukemia was not caused by chloramphenicol, but the testimony of those witnesses was not so overwhelming that the jury had to accept it. Rachelle's experts relied on essentially the same diagnostic methodologies; they simply drew the opposite conclusion from the available information. The case thus presented a *bona fide* "battle of the experts"—real, not merely testifying, experts who applied their true expertise—in which a jury must be allowed to make credibility determinations and weigh the conflicting evidence in order to decide the likely truth of a matter not itself initially resolvable by common knowledge or lay reasoning. *Ferebee,* 736 F.2d at 1535; *accord Wells,* 788 F.2d at 745.[12] We therefore reject Rachelle's challenge to the sufficiency of the evidence concerning causation.[13]

---

**11.** The medical literature documenting an association between chloramphenicol and blood disorders that the Osburn's experts principally relied upon was as follows:

(1) Fraumeni, *Bone Marrow Depression Induced by Chloramphenicol or Phenylbutazone: Leukemia and Other Sequelae,* 201 J.A.M.A. 150 (1967). Dr. Fraumeni conducted the only long-term follow-up study of the effects of chloramphenicol. He received information concerning 124 patients listed in the American Medical Association's Registry of Adverse Drug Reactions and an additional six patients not listed but who had been treated by physicians of listed patients. Of these 130 patients, six cases of leukemia subsequent to chloramphenicol exposure were discovered. After discounting the three reports of leukemia from the six nonlisted patients, Dr. Fraumeni reported a chloramphenicol-induced leukemia ratio of 3/124, compared to the United States age-adjusted annual leukemia mortality ratio of 6/100,000.

(2) Swanson & Cook, *Blood, Chemicals and Blood Dyscrasias* (1977). Dr. Comstock testified that this treatise represented the most comprehensive review then available of the medical literature dealing with blood disorders associated with drugs or chemicals. He said the treatise listed 19 drugs that had been associated with a total of 271 case reports of leukemia thought to be drug-induced. Of these 271 cases, 160 were associated with benzene exposure, 53 with phenylbutazone, and 34 with chloramphenicol. The remaining 24 cases were associated with 16 other drugs, with no more than four of these cases being linked to any one particular drug. In Dr. Comstock's view, the treatise indicated that chloramphenicol was among the three drugs sufficiently associated with leukemia to be considered causally related to the disease.

(3) A 1981 case report in the *Lancet Medical Journal* of a shepherd who suffered from aplastic anemia after administering veterinary chloramphenicol to sheep.

**12.** *See also Certain-Teed Prods. Corp.,* 574 S.W.2d 910 (Kent.Ct.App.1978) (doctor's opinion that benzene caused plaintiff's aplastic anemia sufficient evidence to support Kentucky Workmen's Compensation Board's finding); *Logan Co. v. Amic,* 479 S.W.2d 1 (Kent.1972) (doctor's opinion that benzene caused plaintiff's leukemia was competent evidence of causation, but not so compelling as to make that conclusion the only reasonable one).

**13.** Rachelle further contends that Dr. Benowitz's opinion cannot support a finding of causation because, according to Rachelle, the opinion was based on speculation rather than on any theory backed by scientific data. In making this argument, Rachelle confuses Dr. Benowitz's basis for his conclusion that chloramphenicol caused Mr. Osburn's leukemia with his "aberrant metabolism" theory of the underlying biochemical process that characterizes the disease formation. Dr. Benowitz described what he believed to be the mechanism by which drugs generally thought to cause leukemia (such as benzene and chloramphenicol) have this effect. He said that before the body excretes them, drugs are often converted to other substances called metabolites. Although usually inactive, the metabolites created by some drugs, in some people, are "reactive." Dr. Benowitz believed that chloramphenicol causes some people to produce reactive metabolites and that these metabolites stop the production of normal blood cells, thereby causing aplastic anemia, and promote development of abnormal cells, causing leukemia. Apparently, this theory, which is based on work done by Dr. Adele Yunis, has not yet been supported by scientific data. If Dr. Benowitz's opinion of causation were based solely on this theory, therefore, Rachelle might be correct that Dr. Benowitz's opinion could not provide the requisite support for the jury's verdict. *See Thompson v. Southern Pacific Transp. Co.,* 809 F.2d 1167 (5th Cir.1987); *Marder,* 630 F.Supp. at 1092–93; *In re Agent Orange Prod. Liability Litigation,* 611 F.Supp. 1223, 1262–63 (E.D.N.Y. 1985). We need not decide that question, however. Dr. Benowitz testified that his opinion was based upon the particular facts of Mr. Osburn's case, as contained in his medical records, and the medical literature showing an associa-

## IV. Newly Discovered Evidence

■ Rachelle next complains that the district court erroneously denied its motion for new trial, which it asked for on the basis of newly discovered evidence. Pursuant to Rules 59 and 61 of the Federal Rules of Civil Procedure, the district court has discretion to grant a new trial on this ground.[14] *Johnston v. Lucas,* 786 F.2d 1254, 1257 (5th Cir.1986); *La Fever, Inc. v. All-Star Ins. Corp.,* 571 F.2d 1367, 1368 (5th Cir.1978). We will not disturb the denial of such a motion unless we find a clear abuse of that discretion. *La Fever,* 571 F.2d at 1368. We have said that in deciding whether to grant such a motion, the district court should "consider whether the new facts (1) would probably change the outcome; (2) could have been discovered earlier with due diligence; and (3) are merely cumulative or impeaching." *Johnston,* 786 F.2d at 1257; *see also La Fever,* 571 F.2d at 1368; *English v. Mattson,* 214 F.2d 406, 409 (5th Cir.1954).

The evidence in question here consists of medical records and affidavits from two physical examinations Osburn underwent in the summer of 1981 in order to obtain an ICC truck driver's permit. The records indicate that, in contradiction to Osburn's trial testimony that the physicians who examined him for the permit found his blood count to be normal, no blood tests were performed during these 1981 examinations. According to Rachelle, because Dr. Benowitz relied on Osburn's inaccurate testimony about the results of those physicals in reaching his opinion on causation, the subsequently discovered evidence "would probably have changed the outcome" of the trial.

Osburn's testimony of normal blood counts in 1981 was introduced to show that it was improbable that Osburn had contracted leukemia *prior* to his exposure to the chloramphenicol in 1982, and thus that nothing in Osburn's history suggested his leukemia was caused by something other than chloramphenicol. The absence of any evidence suggesting an "other cause" was stated by Dr. Benowitz to be one of the factors he considered in reaching his causation opinion; however, we do not think Dr. Benowitz would have changed his conclusion that no other causes were apparent had he known that no blood tests were performed on Osburn in 1981. The 1981 test results were just pieces of information that, combined with all the other facts that made up Osburn's medical history, led Dr. Benowitz to this conclusion. The record also contained evidence, for example, indicating that blood tests performed in July 1980 were normal and that Osburn had no known exposure to any other chemicals thought to be associated with leukemia. The medical evidence of record also reflected that Osburn was in good health until shortly before he was diagnosed with leukemia in February 1984. Rachelle has thus not convinced us that the district court abused its discretion in determining that the new evidence was not such as would probably have changed the jury's verdict. Accordingly, we conclude that Rachelle's challenge to the district court's denial of its new trial motion lacks merit.

## V. Damages

### A. Period of loss of wage earning capacity

■ The jury awarded Mr. Osburn a lump-sum verdict of $2,500,000. Rachelle challenges this award on two separate grounds. Rachelle first contends that because the evidence indicated Osburn had a life expectancy of only two to five years

tion between chloramphenicol and blood disorders, including the Fraumeni study and the criteria set forth therein for establishing a causal relationship. Dr. Benowitz's opinion of causation therefore constitutes competent evidence.

**14.** Rachelle also argues that the district court abused its discretion in not granting a new trial on the basis of insufficient evidence of causation. We find this argument unpersuasive. We have said that "[a] trial court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." *Dotson v. Clark Equip. Co.,* 805 F.2d 1225, 1227 (5th Cir.1986); *cf. Dawsey v. Olin Corp.,* 782 F.2d 1254, 1262 (5th Cir.1986). For the reasons outlined in section III of our opinion, we conclude that the jury's verdict was sufficiently supported by the causation evidence presented by the Osburns. We therefore affirm the district court's denial of Rachelle's motion for new trial on this ground.

from date of diagnosis, the jury could not properly have awarded more than $50,000 at the very most for past and future loss of wage earning capacity. According to Rachelle, future loss of earning capacity must be calculated on the basis of actual life expectancy, given the injuries sued for, not on the basis of preinjury work life expectancy. Although this argument has some surface appeal, we find it ultimately unpersuasive.

In support of its argument, Rachelle cites a single Texas case, which held that plaintiffs suing under the Texas "survival statute" could recover for the decedent's lost earning capacity (and other damages) only through the date of his death. *See Norman v. Valley Gin Co.*, 99 S.W.2d 1065 (Tex.Civ.App.1936, writ ref'd). According to Rachelle, the Texas rule for survival actions, which allow heirs to recover damages an injured party would have been entitled to recover had he lived, *see id.* at 1067, should apply equally to Osburn's claim for loss of future earning capacity.

We disagree. The reason that recovery in a survival action is limited to injuries suffered by the decedent only through the date of his death is that as of that date recovery is governed instead by the wrongful death action, which takes over and allows recovery for injuries suffered by the heirs as a result of the decedent's death. *Id.* at 1067 (reaching this conclusion on the basis of statutory ancestors to the current Texas wrongful death and survivorship action statutes); Tex.Civ.Prac. & Rem.Code Ch. 71 (Vernon 1986); *accord* 4 F. Harper, F. James & O. Gray, *The Law of Torts* § 24.6 at 474 & n. 12, and § 25.16 at 612–14

(2d ed. 1986). In contrast, the "prevailing American rule" is that when the plaintiff is the injured party himself (*i.e.*, when trial occurs before the injured party dies), he can recover lost earning capacity on the basis of work life expectancy at the time of his injury *"undiminished by any shortening of that expectancy as a result of the injury."* 4 F. Harper, F. James & O. Gray, *supra*, § 24.6, at 475 (emphasis in original); *see also id.* § 25.8, at 551–52 n. 9; C. McCormick, *Handbook on the Law of Damages* 303 (1935).

No Texas case has expressly articulated this distinction, but it is consistent with Texas case law.[15] Since we see no reason why Texas would deviate from other jurisdictions in this regard, we assume the Texas Supreme Court would follow the majority rule. Consequently, we conclude that the jury was entitled to calculate Osburn's loss of future earning capacity on the basis of the life expectancy Osburn would have had if he had not contracted leukemia.[16]

*B. Excessiveness of damages*

Finally, Rachelle attacks the jury's unitemized damage awards to the Osburns as excessive. The established rule in this Circuit is that we will not disturb a jury verdict for excessiveness except on the strongest of showings. *E.g., Johnson v. Michelin Tire Corp.*, 812 F.2d 200, 207 (5th Cir. 1987); *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983). We have described the degree of excessiveness necessary for judicial intervention as an award so large " 'as to be contrary to right reason,' so exaggerated as to indicate 'bias, passion, prejudice, corruption, or other improper motive,' or as 'clearly exceed-

---

**15.** Since no reported Texas case has addressed this precise issue, we must predict what the Texas Supreme Court would decide if presented with the question. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Louisiana AFL–CIO v. Lanier Business Prods., Inc.*, 797 F.2d 1364, 1366 (5th Cir.1986).

**16.** We note that this measure of damages for lost earning capacity tends to overcompensate because it makes no deduction for living expenses between the time of death and the time the plaintiff would have died had he not been injured. *See* F. Harper, F. James & O. Gray, *supra*, § 25.8 n. 9. In this regard it differs from

the measure of damages in wrongful death actions, which does subtract such living expenses in calculating the contribution the decedent would have made to his heirs. *See id.* § 25.14. This is just a difference in the law regarding the two actions, however; it does not change the rule.

We further note that the present lawsuit of course bars any subsequent wrongful death (or survival) action against Rachelle founded upon Clois Osburn's death as a result of his referenced exposure to Mychel-Vet. *See Prosser and Keeton on Torts* § 127, at 955–56 (W. Keeton 5th ed. 1984).

ing[ing] that amount that *any* reasonable man could feel the claimant is entitled to.' " *Caldarera,* 705 F.2d at 784 (emphasis in original; citations omitted).

In this case, the jury's general damage award of $2,500,000 to Mr. Osburn included the following elements: past and future loss of wage earning capacity, past medical expenses, physical pain and suffering, loss of physical capacity other than wage earning capacity, and mental anguish. We find that based on the evidence in this record, $2,500,000 exceeds the amount the jury could properly have awarded.

 Having determined that the award is excessive, we can either order a new trial on damages or allow plaintiffs the option of avoiding such a new trial by agreeing to a remittitur of the excessive portion of the award. *De Centeno v. Gulf Fleet Crews, Inc.,* 798 F.2d 138, 142 (5th Cir.1986); *Wells v. Dallas Indep. School District,* 793 F.2d 679, 683–84 (5th Cir.1986). This Court follows the maximum recovery rule, according to which remittitur can reduce a damages award only to "the maximum amount the jury could properly have awarded." *Zeno v. Great Atlantic & Pacific Tea Co.,* 803 F.2d 178, 181 (5th Cir. 1986); *Caldarera,* 705 F.2d at 784. Where the district court used a general verdict interrogatory and instructed on several elements of damages, it is sometimes impossible to determine the reason the verdict was excessive. In that event, an appellate court may elect to grant a new trial without providing the option of remittitur. *See Gautreaux v. Insurance Company of North America,* 811 F.2d 908 (5th Cir. 1987); *De Centeno,* 798 F.2d at 143; *In re Aircrash Disaster (Eymard v. Pan Am. World Airways),* 795 F.2d 1230, 1235–36 (5th Cir.1986).

 In this case, however, we think a mandatory new trial on damages is unnecessary and that a remittitur is preferable.

The jury verdict separated Mr. and Mrs. Osburn's damages. Although Mr. Osburn's award lumped together a number of elements, the amount the jury could properly have awarded—and very likely did award—for loss of earning capacity and past medical expenses can be easily calculated on the basis of the evidence in the record.[17] Under the facts of this case, the other damages items upon which the jury was instructed—pain and suffering, mental anguish, and loss of physical capacity—are somewhat amalgamated by their very nature. For purposes of applying our maximum recovery rule, we are therefore able to consider them together. Since we can determine the proper amount for a remittitur in this case despite the district court's failure to submit special interrogatories to the jury on the individual items of damages, we elect not to require a new damages trial.

1. Damages for loss of earning capacity and medical expenses

 The uncontroverted evidence indicates that for the roughly two-year period between diagnosis and trial, Mr. Osburn lost one-half of his $20,000 annual earning capacity. He thus incurred a past loss of earning capacity totaling $20,000. On the basis of Osburn's twenty-year work life expectancy and $20,000 a year earning history, his future earning capacity can be estimated at $400,000.[18] Using a two percent below market discount rate in accordance with *Culver v. Slater Boat Co.,* 722 F.2d 114 (5th Cir.1983) (en banc), *cert. denied,* 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984) (*Culver II*), the present value of Osburn's future loss of earning capacity totals approximately (though slightly less than) $330,000. Adding to this figure the $20,000 for past lost earnings yields a sum of $350,000. Thus, we find that the maximum award permissible under the evidence

---

17. We believe that this case is properly distinguished from *Gautreaux,* for there we noted that "on the record before us we cannot determine to what extent or in what amount Gautreaux's injury impairs his future earnings" and "we are completely unable to determine loss of future earnings." 811 F.2d at 915, 916.

18. The parties stipulated that disregarding the diminution resulting from his leukemia, as of the date of trial Mr. Osburn had a work life expectancy of 19.7 years and a life expectancy of 29.8 years.

for loss of past and future wage earning capacity is $350,000.

As the parties concede, the evidence also indicates that at the time of trial Osburn had paid $6,700 in medical expenses. No evidence was submitted regarding probable medical expenses in the future, and the jury was not instructed to consider that element of damages. The jury could therefore properly have awarded a maximum of $6,700 for medical expenses.

### 2. Pain and suffering, anguish, loss of physical capacity

Subtracting the above amounts from the jury's $2,500,000 award leaves $2,143,300. We cannot be certain that the jury awarded exactly the maximum permissible for earnings and medical expenses, although on this record it is very likely that it at least came quite close to doing so. However, we can with some confidence assume that its award on the remaining elements was in the neighborhood, at least, of the $2,143,300 left over after earnings and medical expenses are taken into account.

The evidence does not justify this approximately two million dollar award for the noneconomic portion of Osburn's losses. We have no doubt that Osburn has suffered and will continue to suffer until his death significant severe mental anguish as a result of the knowledge that his illness is terminal. The evidence shows also that he can no longer participate in his calf-roping hobby or enjoy other leisure activities he could previously perform. But, although he fatigues easily and will undoubtedly suffer pain as the disease progresses, there is no evidence that he will have to endure the sort of continuing, excruciating pain that might support an award more nearly approaching this high sum.

Our task of determining the maximum amount a jury properly could award for these losses is more difficult. In a very

real sense, there is no way to place a monetary value on a person's pain and suffering, especially where the agony is spread over an indefinite period of time. Most of us would not trade two or three million dollars for Mr. Osburn's situation. That cannot be the measure, however, because few indeed would take *any* sum of money in exchange for severe terminal illness or impending death. Yet the very purpose of such damage awards is to affix dollar amounts for losses that cannot be measured in money. We must therefore exercise our best judgment and place some restraint on awards, for as Judge Rubin has said, "[t]he sky is simply not the limit for jury verdicts." *Caldarera,* 705 F.2d at 784.

Based on the evidence in this record and on the rough guidance provided by awards affirmed by this Court for similar injuries,[19] we believe that an award of $1,500,000 is the most a jury could properly have awarded for Osburn's noneconomic losses. Applying our maximum recovery rule, we thus conclude that the total permissible award to Mr. Osburn is $1,856,700. Deducting from this sum the fifteen percent liability attributable to Anchor, the total permissible amount of damages owed to Osburn by Rachelle is $1,578,195. Accordingly, we order a new trial on the issue of Mr. Osburn's damages, unless he will agree to a remittitur to this amount.

### 3. Mrs. Osburn's damages

In response to the district court's instruction that if proven by a preponderance of the evidence, the jury could consider damages to Mrs. Osburn for loss of her husband's love and affection and for loss of his household services, the jury awarded Mrs. Osburn a lump-sum verdict of $500,000. Rachelle challenges this award as

---

**19.** *See Dixon v. International Harvester Co.,* 754 F.2d 573 (5th Cir.1985) (finding maximum permissible award of $750,000 for pain and suffering to plaintiff who suffered thirty minutes of intense pain while pinned by pine sapling that jutted into the tractor cab he was driving, and substantial physical and psychological pain for

the remaining two and a half years until he died for unrelated reasons); *Sosa v. M/V Lago Izabel,* 736 F.2d 1028 (5th Cir.1984) (opining that one million dollars approached maximum for pain and suffering to seaman who was burned on eighty percent of his body surface).

excessive as well. We conclude, however, that although it closely approaches the maximum the jury could have properly awarded, it is not excessive.[20] The evidence indicates that Mr. and Mrs. Osburn enjoyed a close, loving relationship and that they remained happy together after almost twenty years of marriage. With regard to Mrs. Osburn's loss of her husband's household services, she testified that Mr. Osburn performed many chores for her and the family. Since the Osburns live in a rural environment, the value of those services may be greater than in an urban setting. We therefore sustain the jury's $500,000 award to Mrs. Osburn.[21]

### Conclusion

The district court shall order a new trial on Mr. Osburn's claims for damages unless Mr. Osburn agrees, within the time specified by the district court following remand, to a remittitur of the award to $1,578,195. We therefore vacate the damage award to Clois Osburn, and in all other respects affirm the judgment below. We remand the cause for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED.

---

**20.** *See In re Air Crash Disaster (Giancontieri v. Pan Am. World Airways, Inc.)*, 767 F.2d 1151 (5th Cir.1985) (under facts of case, $500,000 was maximum for loss of love and affection of wife and $200,000 was within maximum for loss of her household services); *Winbourne v. Eastern Airlines, Inc.*, 758 F.2d 1016 (5th Cir.1984) (affirming $500,000 award for loss of wife's love and affection).

**21.** We have some question about whether the portion of Mrs. Osburn's award that compensates for her economic loss duplicates the losses for which Mr. Osburn recovered. But the jury was not instructed about any potential duplication and the issue has not been briefed or argued to us. Accordingly, we take no cognizance of it.